IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE TESLA, INC. DIRECTOR COMPENSATION STOCKHOLDER LITIGATION | § § § § § § § § § | CONSOLIDATED No. 52, 2025 & No. 53, 2025 Court Below: Court of Chancery of the State of Delaware C.A. No. 2020-0477 |

Submitted: October 29, 2025
Decided: January 30, 2026

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **AFFIRMED IN PART AND REVERSED IN PART**.

John L. Reed, Esquire, Ronald N. Brown, III, Esquire, DLA PIPER LLP (US), Wilmington, Delaware; Jason C. Jowers, Esquire, Brett M. McCartney, Esquire, Sarah T. Andrade, Esquire, BAYARD, P.A., Wilmington, Delaware; Brian T. Frawley, Esquire, Matthew A. Schwartz, Esquire, SULLIVAN & CROMWELL LLP, New York, New York; Jeffrey B. Wall, Esquire, Morgan L. Ratner, Esquire (*argued*), SULLIVAN & CROMWELL LLP, Washington, D.C. *for Nominal Defendant-Below/Appellant, Tesla, Inc.*

Andrew S. Dupre, Esquire (*argued*), AKERMAN LLP, Wilmington, Delaware; Derrick Farrell, Esquire, BLEICHMAR FONTI & AULD LLP, Wilmington, Delaware; Javier Bleichmar, Esquire, Joseph A. Fonti, Esquire, Nancy A. Kulesa, Esquire, George N. Bauer, Esquire, Thayne Stoddard, Esquire, BLEICHMAR FONTI & AULD LLP, New York, New York; William J. Fields, Esquire, Christopher J. Kupka, Esquire, Samir Shukurov, Esquire, FIELDS KUPKA & SHUKUROV LLP, Pleasantville, New York *for Plaintiff-Below/Appellee, The Police and Fire Retirement System of the City of Detroit.*

Raymond J. DiCamillo, Esquire, Kevin M. Gallagher, Esquire, Kyle H. Lachmund, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Vanessa A. Lavely, Esquire, CRAVATH, SWAINE & MOORE LLP, New York, New York *for Defendants-Below/Appellees, Elon Musk, Brad Buss, Robyn M. Denholm, Ira Ehrenpreis, Lawrence J. Ellison, Antonio J. Gracias, Stephen T. Jurvetson, Linda Johnson Rice, James Murdoch, Kimbal Musk, Kathleen Wilson-Thompson, and Hiromichi Mizuno*.

Michael R. Levin, *pro se*, Chicago, Illinois.

**SEITZ**, Chief Justice:

This is an appeal from a derivative litigation settlement resolving excess compensation claims against Tesla, Inc.'s non-employee directors. In its Court of Chancery complaint, the plaintiff alleged that, from 2017 to 2020, the directors received excessive stock options for their board service. After discovery and mediation, the parties settled the dispute. The directors agreed to, among other things, return to Tesla cash and stock as well as some of their unexercised stock options. The Court of Chancery approved the settlement and awarded attorney's fees.

Tesla has appealed the Court of Chancery's fee award. It argues that the court awarded excessive fees by including in its financial benefit analysis the intrinsic value of stock options returned to Tesla. Tesla argues that the court should have considered only the value of the returned options to Tesla, not their value to the directors. It also contends that the court applied an excessive percentage to the financial benefit. In a separate appeal, an objector has challenged the Court of Chancery's settlement approval.

For the reasons explained below, we find that the court erred by including in its financial benefit analysis the intrinsic value of the returned options. Our holding moots Tesla's second issue on appeal. Thus, we reverse and modify the fee award. We also affirm the court's judgment approving the settlement.

3

I.

A.

We limit our review of the background facts and procedural history to the two issues raised on appeal – the objections to the settlement and the Court of Chancery's use of the intrinsic value of the returned stock options in its benefit analysis. In June 2020, The Police and Fire Retirement System of the City of Detroit (the "Plaintiff") filed a derivative suit against current and former non-employee Tesla board members (the "Director Defendants") and Elon Musk (together, the "Defendants").[1] As its primary claim, the Plaintiff alleged that the Director Defendants breached their fiduciary duty of loyalty by granting themselves "excessive and unfair" compensation packages. The Plaintiff also alleged that Musk's approval of the packages breached his fiduciary duty of loyalty.

After discovery and mediation, the parties settled the litigation and entered into a July 14, 2023 Stipulation and Agreement of Compromise and Settlement ("Stipulation").[2] In the Stipulation, the Directors agreed that, in exchange for

---

[1] The Director Defendants are Brad Buss, Robyn M. Denholm, Ira Ehrenpreis, Antonio J. Gracias, Stephen T. Jurvetson, Kimbal Musk, James Murdoch, Linda Johnson Rice, Lawrence J. Ellison, Kathleen Wilson-Thompson, and Hiromichi Mizuno. App. to Opening Br. at A66–67 [hereinafter "A__"] (Verified S'holder Deriv. Compl. [hereinafter Compl.]).

[2] A260–97 (Stipulation). In this opinion we use the capitalized terms as defined in the Stipulation.

4

releases, they would "provide to Tesla the value of 3,130,406 options,"[3] which the parties agreed equaled $735,266,505 ("Settlement Option Amount").[4] The Settlement Option Amount represented the "in the money" returned options valued at $458,649,785 ("Returned Options") and "$276,616,720 in Returned Cash and/or Returned Stock."[5] "The value of each Returned Option [was the] difference between [the closing price of Tesla stock on June 16, 2023] and the actual strike price of each Returned Option,"[6] that is, the "intrinsic value" of the Returned Options.[7]

According to the Stipulation, "[t]he number of authorized shares under Tesla's 2019 Equity Incentive Plan (as described in Tesla's SEC's filings) [would be] increased by the total number of Returned Options upon cancelation of the Returned Options."[8] In other words, once the Director Defendants returned the options to

---

[3] A275 (Stipulation § 2.1).

[4] A277 (Stipulation § 2.6).

[5] *Id*. The Stipulation defined Returned Options, Returned Cash and Returned Stock in Section 2.2. "Director Defendants shall return the Settlement Options in the form of (i) cash ('Returned Cash'), (ii) unrestricted common shares of Tesla stock ('Returned Stock'), and/or (iii) unexercised Tesla options awarded as compensation to the Director Defendants [between June 17, 2017, and July 14, 2023] ('Returned Options')." A275 (Stipulation § 2.2).

[6] A276 (Stipulation § 2.3).

[7] *See* Opening Br. Ex. B (Telephonic Rulings of the Ct. on Settlement, Award of Attorneys' Fees and Expenses, and Incentive Award at 29:3–8 [hereinafter Bench Ruling]) ("Plaintiff's counsel argues that the returned options should be valued in the same way as the returned stock – using the value of the canceled shares at the time of the settlement. This is, as I understand it, a way of measuring the intrinsic value of the underlying shares.").

[8] A276 (Stipulation § 2.3).

5

Tesla, the company cancelled the options.[9]  Tesla could then use the reserved shares for employee compensation.  Kenneth Moore, Tesla's director of finance, stated that the addition of the Returned Options "represent[ed] approximately 1.4% of the [s]hares available for issuance under the 2019 [Equity Incentive Plan] as of August 31, 2023."[10]

The Stipulation also provided that the Director Defendants would forgo any compensation, equity-based or otherwise, for 2021 and 2022.  The then-serving Directors also agreed to forgo all compensation for 2023.  The Stipulation did not value the forgone compensation.  The Plaintiff argued, however, that "using the same valuation methodology" to calculate the Settlement Option Amount, the estimated value of the forgone compensation was about $184 million.[11]

In addition, the Plaintiff secured corporate governance reforms.  Among other things, the Defendants agreed to Compensation Committee charter amendments focused on its oversight role, annual board review of non-employee director compensation, annual unaffiliated stockholder approval votes for non-employee

---

[9] *Id.* ("Tesla shall cause the Returned Options to be canceled on the next Business Day after Final Approval.").

[10] A521 (Aff. of Kenneth Moore in Supp. of Tesla's Opp'n to Pl.'s Counsel's Req. for Award of Attorney's Fees and Expenses ¶ 15 [hereinafter Moore Aff.]).

[11] A441 (Pl.'s Corr. Opening Br. in Supp. of Settlement Approval, Award of Attorneys' Fees and Expenses, and Incentive Award at 40).

6

director compensation, and additional proxy disclosures regarding non-employee director compensation. The Compensation Committee also agreed to an immediate review of Tesla's internal controls specific to non-employee director compensation.

Section 6 of the Stipulation addressed "Attorneys' Fees and Expenses." Section 6.1 provided that any fee award "shall be paid by Tesla out of the Settlement Option Amount . . . and shall reduce the settlement consideration paid to Tesla accordingly."[12] The parties also agreed that, after paying costs and the Fee and Expense Award, "Tesla shall retain the balance of the Settlement Option Amount."[13] The Defendants did not agree in the Stipulation that any benefit had been conferred on Tesla by the settlement.

B.

The Plaintiff and the Defendants requested that the court approve the settlement. The Plaintiff's counsel also requested $229,600,687 in attorneys' fees and $1,023,779 in expenses. The request added up to 25% of the settlement value as calculated by counsel or $918,402,752 ($735,266,505, the Settlement Option Amount, plus $184,160,026, the Plaintiff's valuation of the forgone compensation, minus $1,023,779, counsel's out-of-pocket litigation expenses).[14]

---

[12] A286–87 (Stipulation § 6.1).

[13] A287–88 (Stipulation § 7.1(c)).

[14] *See* A404 (Pl's. Corr. Opening Br. in Supp. of Settlement Approval, Award of Attorneys' Fees and Expenses, and Incentive Award at 3). The Plaintiff's counsel request for $1,023,779 in out-

The Defendants supported the settlement, but Tesla opposed the fee request. In opposing the fee award, it did not dispute that the Returned Cash and the Returned Stock represented a dollar-for-dollar benefit to Tesla. But it contested counsel's use of the intrinsic value of the Returned Options to determine the benefit to Tesla. First, as Tesla argued, the parties included the intrinsic value of the Returned Options in the Stipulation to allow the Director Defendants to calculate the number of unexercised options to return to Tesla. Tesla did not agree that it reflected the value of those returned options to Tesla for the fee award. Second, according to Tesla, "the value of an option in the hands of a Director Defendant is not the same as the value of that option in the hands of Tesla."[15] Unlike the Director Defendants who could have exercised the Returned Options, Tesla had to cancel the Returned Options. Therefore, only a $19.9 million grant date fair value ("GDFV"), it argued, corresponded to the future accounting benefit Tesla would recognize when it "reverse[d] the Black-Scholes charge that it took when [the Returned Options] were issued."[16] Finally, Tesla argued that the court should disregard any valuation of the

of-pocket litigation expenses and $50,000 incentive fee for the Plaintiff were approved by the Court of Chancery. Neither award is challenged on appeal.

[15] A485 (Nominal Def. Tesla, Inc.'s Answering Br. in Opp'n to Pl's. Counsel's Request for Award of Attorneys' Fees and Expenses at 9).

[16] Id.

forgone compensation for lack of evidence that the Director Defendants would have ultimately awarded themselves those options.

Without the intrinsic value of the unexercised options, the Defendants valued the monetary benefit of the settlement at $295,492,233 ($276,616,720 of Returned Cash and/or Returned Stock, plus the $19,899,292 million future accounting benefit from cancelling the Returned Options, minus $1,023,779, counsel's out-of-pocket litigation expenses).[17]

Shareholder Michael Levin and three others opposed the settlement. Specific to Mr. Levin's objections, he argued first that the Stipulation should have expressly required the Director Defendants to contribute ratably to the settlement. And second, he claimed that the term "approval vote" was ambiguous. He sought an assurance that the term "approval vote" was not merely advisory, but rather, would be binding if the stockholders were to vote against a proposed compensation arrangement.

### C.

The Court of Chancery approved the Stipulation over Mr. Levin's objection. The court accepted the Director Defendants' representation that each of them would fund the Settlement in proportion to the compensation that he or she received during the relevant period. For Mr. Levin's second objection, the court stated, "[a]s I read

---

[17] A503 (Nominal Def. Tesla, Inc.'s Answering Br. in Opp'n to Pl's. Counsel's Request for Award of Attorneys' Fees and Expenses at 27).

the stipulation, the company is committing to condition director compensation on approval by the minority stockholders. That agreement and that term is as enforceable as any corporate agreement."[18] The court took the Director Defendants at their word that "approval" meant the vote was binding, and not merely advisory.[19] Thus, the court dismissed the objection.

For the fee request, the court used the percentage of the benefit method to fix the fee amount. First, the court observed that "neither side attempts to value the governance benefits, so I too will ignore that category."[20] Second, the court found it hard to quantify the value of the forgone compensation. The court also thought that including a value for those benefits might lead to a windfall to counsel. Thus, it assigned no value to those benefits.[21]

Third, the court considered whether to include the intrinsic value of the stock options in the benefit calculation. The court started its analysis by noting that, "[u]nlike in *Tornetta* [*v. Musk*], plaintiff does not argue that because the shares were fully vested they were priced into Tesla's trading price. Nor does Plaintiff advance

---

[18] Bench Ruling at 23:17–21.

[19] *See id.*

[20] *Id*. at 28:3–5.

[21] *Id*. at 31:21–32:22.

10

a reverse dilution theory."[22] Instead, the court noted that the "Plaintiff's primary argument for adopting this methodology is the Settlement Stipulation itself."[23] In the Stipulation, the parties agreed that the value of each Returned Option would be calculated by ascertaining the difference between the Settlement Stock Price and the actual strike price for each Returned Option. According to the court, the Plaintiff's "approach ha[d] merit" and "conform[ed] with the language of the stipulation, as well as the methodology recently adopted by [the Court of Chancery] in cases like Vice Chancellor Glasscock's decision in *Wilcox v. Dolan*."[24]

The court was not persuaded by Tesla's argument that the formula was intended for a different purpose and did not reflect the benefit to the company. According to the court, the Stipulation "speaks for itself."[25] Also, the court did "not understand why Defendants would agree to use an intrinsic value formula for the returned stock but not the returned options – the theoretical problems with that approach are largely the same for both when the options are vested. And there is an argument that they are priced into the market."[26]

---

[22] *Id*. at 29:9–12.

[23] *Id*. at 29:13–14.

[24] *Id*. at 29:15–23.

[25] *Id*. at 30:12.

[26] *Id*. at 30:11–18.

Finally, the court stated that it had already rejected a version of the "benefit to Tesla alone" argument in its *Tornetta* fee decision. According to the court, it reasoned in *Tornetta* that, "under Delaware law, investor-level benefits are a proper basis for compensating plaintiff's counsel."[27]

The court also rejected Tesla's GDFV alternative. According to the court, "[a]lthough this approach [GDFV] tracks with the approach adopted in *Tornetta*," the court "did so to avoid awarding a windfall in fees."[28] The court also stated that GDFV should be used as a value metric only in "exceptional cases" when "the intrinsic value of the returned stock options at the time of litigation would have resulted in a multibillion dollar fee award."[29] The court concluded that the "Plaintiffs['] proposed fee award based on intrinsic value falls within what our court has held to be a reasonable range and therefore, does not warrant deviating from the approach that the parties stipulated to."[30]

---

[27] *Id*. at 30:23–24.

[28] *Id*. at 31:3–7.

[29] *Id*. at 31:8–12.

[30] *Id*. at 31:13–17.

Using a $458 million Returned Options value, the court awarded 24 % of the total benefit achieved (which the Court of Chancery rounded to $734 million) or $176,160,000.[31]

## II.

On appeal, Mr. Levin repeats the arguments he made in the Court of Chancery. Tesla argues that the Court of Chancery erred when it calculated the benefit conferred by the settlement. According to Tesla, the court valued the Returned Options based on their "in the money" or intrinsic value. But, Tesla says, in a derivative suit, the court should consider only the financial benefit to Tesla and not the loss to third parties by the settlement. In Tesla's view, the GDFV represented the financial benefit to Tesla.

Tesla also argues that the Stipulation did not require that the court use the intrinsic value to determine the financial benefit. According to Tesla, the intrinsic value was included only to allow the Director Defendants to calculate how many options to return, and not to fix the value as a benefit to Tesla. Tesla claims that the total financial benefit of the settlement to Tesla should have been $296.5 million. And, Tesla argues, it never agreed in the Stipulation that $458.6 million represented the value of the Returned Options to Tesla.

---

[31] *Id*. at 34:5–6.

The Plaintiff's counsel responds that the Stipulation expressly required the Director Defendants to "deliver to Tesla the value of the Settlement Options, which is equal to $735,266,505."[32]  And, they argue, Tesla agreed that fees and expenses would be paid "out of the Settlement Option Amount," which was defined as $735,266,505.[33]  As counsel sees it, Tesla benefitted by $735,266,505 when the Director Defendants returned the options.  The Stipulation therefore valued the benefit to Tesla at that number.  The GDFV of the Returned Options, they contend, is limited to exceptional cases because it is not a valid measure of value.  Further, according to counsel, after *Tornetta*, the Returned Options represent an investor-level benefit.  Finally, counsel argues that, even if the Returned Options were not an investor-level benefit, Tesla received a financial benefit from the Returned Options because "it can use the stock underlying the Returned Options to compensate employees or raise capital through sales at market prices."[34]

We review the court's decision to approve the settlement and the reasonableness of the attorney's fees award to decide whether the court exceeded its

---

[32] Answering Br. at 5 (quoting Stipulation § 2.6).

[33] *Id*. (quoting Stipulation § 6.1).

[34] *Id*. at 6.

discretion.[35]  When, however, "the challenged award of fees 'requires the formulation of legal principles . . . that formulation is subject to *de novo* review.'"[36] "We review the Court of Chancery's contractual interpretation *de novo*."[37]  All other "[e]rrors of law are reviewed de novo."[38]

## A.

We start by addressing Mr. Levin's appeal from the Court of Chancery's settlement approval.  The court relied on representations by counsel that addressed each of his objections.  It was within the Court of Chancery's discretion to do so, and we affirm the court's approval of the settlement.[39]

## B.

Turning to the fee award, the common fund doctrine, an exception to the American Rule, allows the plaintiff's counsel "to be paid from the fund or property which his efforts have created," as long as those efforts "specifically and

---

[35] *In re Dell Techs. Inc. Class V S'holders Litig.*, 326 A.3d 686, 697 (Del. 2024); *Kahn v. Sullivan*, 594 A.2d 48, 62–63 (Del. 1991).

[36] *In re Delaware Pub. Schs. Litig.*, 312 A.3d 703, 715 (Del. 2024) (quoting *Gannett Co., Inc. v. Bd. of Managers of the Del. Crim. Just. Info. Sys.*, 840 A.2d 1232, 1240 (Del. 2003)).

[37] *Exit Strategy, LLC v. Festival Retail Fund BH, L.P.*, 326 A.3d 356, 363 (Del. 2024) (citing *Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 845 (Del. 2019)).

[38] *Dell*, 326 A.3d at 697 (citing *Dover Historical Soc'y, Inc. v. City of Dover Planning Comm'n*, 902 A.2d 1084, 1089 (Del. 2006)).

[39] *See Kahn*, 594 A.2d at 63 (holding that the Court of Chancery did not exceed its discretion to approve a settlement where its decision was "the product of an orderly and logical deductive process").

substantially benefited the class which, in a derivative action, is the corporation."[40]

The plaintiff's counsel can also be compensated for non-quantifiable benefits to the corporation.[41] The court considers the factors in *Sugarland Industries, Inc. v. Thomas* when determining a reasonable fee award.[42] Those factors are: "1) the results achieved; 2) the time and effort of counsel; 3) the relative complexities of the litigation; 4) any contingency factor; and 5) the standing and ability of counsel involved."[43] The "[p]laintiff bears the burden of establishing the value of any benefit conferred."[44] Before approving the settlement, "the Court of Chancery must make an independent determination of reasonableness. . . ."[45]

Here, we address the only contested *Sugarland* factor – the benefit achieved through the litigation and settlement. It is undisputed that about $296 million was returned to Tesla, consisting mostly of Returned Cash and/or Returned Stock, and resulted in a common fund that directly benefitted Tesla. And counsel has not cross-

---

[40] *Chrysler Corp. v. Dann,* 223 A.2d 384, 386 (Del. 1966) [hereinafter *Chrysler II*].

[41] *See, e.g.*, *Ryan v. Gifford*, 2009 WL 18143, at *13 (Del. Ch. Jan. 2, 2009) (awarding fees for the cancellation, re-pricing, and surrender of stock options, which the court referred to as a "non-monetary recovery").

[42] 420 A.2d 142, 149–50 (Del. 1980).

[43] *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1254 (Del. 2012) (citing *Sugarland Indus., Inc.*, 420 A.2d at 149).

[44] *Garfield v. Boxed, Inc.*, 2022 WL 17959766, at *10 (Del. Ch. Dec. 27, 2022).

[45] *Dell*, 326 A.3d at 697 (citing *Goodrich v. E.F. Hutton Grp., Inc.*, 681 A.2d 1039, 1045–46 (Del. 1996)).

16

appealed the court's ruling addressing other non-quantifiable benefits. Thus, the dispute centers on the $458 million intrinsic value of the returned, unexercised options that Tesla cancelled.

We reverse the Court of Chancery's decision to include $458 million in the benefit calculation because, as explained below: (1) Tesla did not agree in the Stipulation that the intrinsic value of the Returned Options benefitted Tesla; (2) regardless, the court had an independent duty to evaluate the benefit to Tesla; and (3) the court should not have included the $458 million in Returned Options as an investor-level benefit in its fee calculation.

1.

First, we disagree with the court that the Stipulation required the court to include the intrinsic value of the Returned Options in the benefit calculation. In our view, the Stipulation is unambiguous on this point.[46] The Director Defendants did not agree to return all their unexercised options. Instead, the Stipulation required the Director Defendants to "deliver to Tesla the value of the Settlement Options, which is equal to $735,266,505."[47] The $458 million Returned Options value included in the total was needed to calculate how many options to return. Neither

[46] *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023) ("Where language is unambiguous, we 'will give effect to the plain meaning of the contract's terms and provisions.'") (quoting *Manti Hldgs, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021)).

[47] A277 (Stipulation § 2.6).

17

the Defendants nor Tesla agreed in the Stipulation that the $458 million Returned Options' intrinsic value should be included in the financial benefit for purposes of awarding fees.

The Court of Chancery dealt with a similar situation in *Dann v. Chrysler Corporation*.[48] The settlement stipulation in *Dann* provided that "the individual defendants hereto and Chrysler acknowledge[d] that the aforesaid modification of the authorization for incentive compensation awards by Chrysler is the result of the bringing of the litigation and the specific suggestion of plaintiffs' counsel."[49] Dann's attorneys claimed that, by the settlement stipulation language, the defendants agreed that the plaintiffs' attorneys had conferred a benefit on Chrysler.

But as the court "construe[d] the terms of settlement," Chrysler had not conceded the point without express language in the settlement stipulation agreeing to it. As the court held, "Chrysler did not explicitly agree that, for purposes of fee allowances, plaintiffs conferred any benefit upon Chrysler."[50] Nor did Tesla do so here.

Our reading fits with other Stipulation provisions. By accepting and cancelling the Returned Options, Tesla did not receive $458 million in value that

---

[48] 215 A.2d 709 (Del. Ch. 1965), *aff'd*, *Chrysler II*, 223 A.2d 384.

[49] *Id*. at 712.

[50] *Id*.

18

contributed to a common fund. This is because Section 2.3 required Tesla to "cancel[]" the Returned Options upon settlement approval and return the underlying shares to the 2019 Equity Incentive Plan.[51] Tesla could not, for example, accept the returned options, exercise the options, and sell the underlying shares for their then-current market value.[52]

Further, Section 6.1 stated that "any" fee award "*shall be paid by Tesla* out of the Settlement Option Amount . . . and shall reduce the settlement consideration *paid to Tesla* accordingly."[53] Although the Settlement Option Amount included the intrinsic value of the Returned Options, the Returned Options did not contribute liquid assets that could be "paid by Tesla" to the Plaintiff's attorneys. In the same manner, the Returned Options could not reduce the consideration "paid to Tesla."

---

[51] A276 (Stipulation § 2.3).

[52] The Plaintiff's counsel argues that although the Stipulation requires the shares underlying the Returned Options to be returned to the 2019 Equity Incentive Plan ("EIP"), the company could nevertheless "use the underlying shares for any proper corporate purpose." Answering Br. at 53. According to counsel, the 2019 EIP "only requires Tesla to 'reserve and keep available such number of [s]hares as will be sufficient to satisfy the requirements of the Plan.'" *Id*. at 54 (citing App. to Answering Br. at B13 [hereinafter "B__"] (2019 Equity Incentive Plan, Ex. 4.2 to Form S-8, Registration Statement, Tesla, Inc. (June 12, 2019)) [hereinafter 2019 EIP]). Counsel argues that this "suggests that if the returned shares result in a total that exceeds what needs to be reserved," the company "could" use the underlying shares for any corporate purpose. *Id*. This argument is highly speculative and conflicts with other 2019 EIP provisions. *See* B13 (2019 EIP) ("If an [a]ward expires or becomes unexercisable without having been exercised in full . . . [the underlying shares] subject thereto *will become available for future grant under the Plan.*") (emphasis added).

[53] A286–87 (Stipulation § 6.1) (emphasis added).

19

Finally, even if the Stipulation provided otherwise, the court must make an independent inquiry into the value of the benefit conferred on the corporation.[54]

2.

The court relied primarily on the Stipulation to include the Returned Options' intrinsic value in its benefit analysis. It was not, however, the only basis. The court also noted that, in *Tornetta*,[55] it considered a "priced into Tesla's trading price" valuation or "reverse dilution" valuation as a path to quantifiable investor-level benefits for a derivative fee award. Even though the court recognized that counsel in this case did not pursue those valuations, it found nonetheless that *Tornetta* applied. According to the court, the Returned Options' $458 million intrinsic value resulted in a quantifiable investor-level benefit, which was "a proper basis for compensating plaintiff's counsel" in a derivative case.[56]

As explained below, derivative litigation is brought on behalf of the corporation. Thus, the court typically should look to the benefit to the corporation

---

[54] *See Sciabacucchi v. Howley*, 2023 WL 4345406, at *2, *4–6 (Del. Ch. July 3, 2023) (despite the company agreeing in derivative settlement stipulation that the actual "benefit" of a term prohibiting cash dividend equivalent payments was $23.8 million, the court found that the valuation rested on a series of "assumptions and unknowns" making a percentage of the benefit approach to fees inappropriate and awarding counsel $1 million for the "therapeutic benefits"); *Goodrich,* 681 A.2d at 1045–46 (Del. 1996).

[55] *Tornetta v. Musk*, 326 A.3d 1203 (Del. Ch. 2024), *rev'd on other grounds*, *In re Tesla, Inc. Deriv. Litig.*, 2025 WL 3689114 (Del. Dec. 19, 2025).

[56] Bench Ruling at 30:23–24.

20

when awarding fees. There are situations in which the court has endorsed investor-level relief in cases involving derivative claims. The Court of Chancery has recognized, however, that those cases are limited to situations in which entity-level relief would be economically inefficient, would not redress the wrong suffered, or would allow the wrongdoer to benefit from the wrongdoing. Returning unexercised stock options for cancellation does not fit within these exceptions.

i.

In *Brookfield Asset Management, Inc. v. Rosson*,[57] we reaffirmed the distinction between direct and derivative claims explained in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*[58] – in a derivative action, "the recovery, if any, flows only to the corporation."[59] It follows that, in assessing the benefit in a derivative suit recovery, the court should, in general, focus on the benefit to the corporation.[60]

In *Tornetta*, the Court of Chancery decided that "*Brookfield* does not demand that this court ignore investor-level benefits when valuing benefits of derivative lawsuits for the purpose of awarding attorney's fees."[61] According to the court,

---

[57] 261 A.3d 1251 (Del. 2021).

[58] 845 A.2d 1031 (Del. 2004).

[59] *Id*. at 1036.

[60] *Chrysler II*, 223 A.2d at 386 (observing that in a derivative action the benefited class is the corporation).

[61] *Tornetta*, 326 A.3d at 1245.

"The transitive property of entity litigation recognizes that a derivative action that asserts claims for breaches of fiduciary duty . . . and an investor class action that asserts similar theories . . . can be functionally equivalent and, therefore, substitutes." In other words, "an entity-level recovery can be the equivalent of an investor-level recovery and *vice versa*" and one can be "reframed" as the other. Indeed, under these principles, derivative actions are routinely resolved "using investor-level relief."[62]

The Court of Chancery has recognized that, when fashioning a remedy in cases involving derivative claims, the court can, in certain situations, exercise its equitable authority or approve derivative settlements that benefit the stockholders directly or prevent wrongdoers from profiting from their wrongs. For instance, in *Goldstein v. Denner*, relied upon by the court in *Tornetta*, the court thoroughly explored when investor-level benefits are appropriate.[63] The Court of Chancery concluded that an investor-level remedy could be ordered in a derivative case, but in certain recurring circumstances.

Specifically the court in *Goldstein* observed that, commentators have "generalize[d] from the various precedents" that there are "recurring scenarios" for "investor-level recovery on an entity-level claim:"[64]

- Cases where the defendants are insiders who misappropriated corporate property such that an entity-level recovery would return the property to the wrongdoers' control.

---

[62] *Id*. at 1245–46 (citations omitted).

[63] *Goldstein v. Denner*, 2022 WL 1797224, at *17–20 (Del. Ch. June 2, 2022).

[64] *Id*. at *17.

• Cases where an entity-level recovery would benefit "guilty" stockholders, but an investor-level recovery could be more narrowly tailored to benefit only "innocent" stockholders.

• Cases where the entity is no longer an independent going concern, such that channeling the recovery through the corporation is no longer feasible or a *pro rata* recovery is more efficient.[65]

The court noted that, at times, courts have "granted *pro rata* recoveries in derivative actions at the request of the defendants" to allow the defendants to "pay less in terms of the aggregate amount of damages."[66] The court also pointed to Delaware decisions where the court approved derivative action settlements with "some form of stockholder-level consideration, such as either a dividend to stockholders or a buyout to the minority."[67] In *Goldstein*, the court concluded that,

---

[65] *Id*. (citations omitted).

[66] *Id*. at *18 (citing *Brown v. DeYoung*, 47 N.E. 863, 865 (Ill. 1897); *Matthews v. Headley Chocolate Co.*, 100 A. 645, 651 (Md. 1917); *Shanik v. Empire Power Corp.*, 58 N.Y.S.2d 176, 181–82 (N.Y. Sup. Ct. 1945); *Joyce v. Congdon*, 195 P. 29, 30 (Wash. 1921); Note*, Personal Recovery By Shareholders For Injury To Corporation*, 2 U. Chi. L. Rev. 317, 321 (1935)).

[67] *Id*. at *18–19 (summarizing *Baker v. Sadiq*, 2016 WL 4375250, at *4–5 (Del. Ch. Aug. 16, 2016) (derivative settlement structured as cash payment to buy out the minority stockholders); *In re Clear Channel Outdoor Hldgs, Inc. Deriv. Litig.*, C.A. No. 7315, Dkt. No. 97 at 35, 38 (Del. Ch. Sep. 9, 2013) (TRANSCRIPT) (settlement included special dividend to minority stockholders); *Davis v. Holmes*, C.A. No. 638, Dkt. No. 161 at 4, 23 (Del. Ch. June 21, 2006) (TRANSCRIPT) (approving settlement for what "really [was] a derivative claim," where the settlement included the creation of a $3.2 million fund distributed as dividend to common stockholders); *In re Freeport-McMoRan Copper & Gold Inc. Deriv. Litig.*, C.A. No. 8145, Dkt. No. 265 at 70 (Del. Ch. Apr. 7, 2015) (TRANSCRIPT) (settlement included $137.5 million special dividend for the minority stockholders); *Franklin Balance Sheet Invs. Fund v. Crowley*, 2007 WL 2495018, at *1-2 (Del. Ch. Aug. 30, 2007) (settlement required defendants taking nominal defendant private via a short form merger, therefore, investor-level benefit was the *pro rata* value of stock); *Gerber v. EPE*

23

in a derivative case, "the functional and equitable equivalent of an entity-level recovery can be an investor-level recovery" such that "the injured investors receive their *pro rata* share of the amount that otherwise would go to the entity."[68]

The court in *Tornetta* also relied on *Baker v. Sadiq*.[69] There, the plaintiffs brought a derivative suit against Navseeker, Inc. and its controlling stockholder, seeking $25 million in damages for misappropriating technology from NavSeeker.[70] At the time, NavSeeker's value was between $20-25 million. The minority stockholders not affiliated with the defendants owned 10.75% of Navseeker's equity. Even assuming a full recovery, the minority stockholders stood to gain about $2.6 million through an "indirect increase in the value of their shares."[71]

In the settlement, the parties agreed that, among other things, the controller or other affiliated entities would pay $2.75 million to Navseeker and forgive $500,000 in debt. NavSeeker agreed to use the money to buy out the minority stockholders.

---

*Hldgs, LLC*, C.A. Nos. 5989 & 3543, Dkt. 103 at 22, 25 (Del. Ch. July 1, 2014) (TRANSCRIPT) ($12.4 million cash payment to minority stockholders who owned about 22% of the company)).

[68] *Id*. at *19 (citing *Baker*, 2016 WL 4375250, at *1).

[69] 2016 WL 4375250, at *4–5.

[70] *Id.*

[71] *Id*. at *5.

The parties stipulated that the $2.75 million payment was a corporate benefit, but counsel reserved the right to argue that the corporate benefit exceeded that amount.[72]

The Court of Chancery approved the settlement and explained how the derivative settlement payment structure benefitted all the settling parties:

> The controllers only had to come up with $2.75 million instead of $25 million. The minority investors got real cash instead of an indirect increase in the value of their shares. Plus they were able to exit from a controlled company where they contended the controllers were engaging in wholesale misappropriation. And both sides severed a troubled relationship and put an end to the burdens of litigation.[73]

When it came to the fee award, counsel sought $6 million, arguing for the $25 million "implied derivative recovery" value instead of the $3.25 million paid to the minority stockholders ($2.75 million to fund the minority buyout plus the $500,000 discharge of NavSeeker debt).[74] The court held that "formal structure matters," meaning that it could not "value the benefit conferred . . . greater than $3.25 million," the financial benefit conferred on Navseeker, Inc.[75] In other words, the minority stockholders received an investor-level benefit, but the court limited its benefit analysis to the amount Navseeker actually received through the settlement.

---

[72] *See id*. at *4–5.

[73] *Id*. at *5.

[74] *Id*.

[75] *Id*. at *6.

25

Specific to derivative litigation involving options, other than *Tornetta*, the court has not treated settlements involving options as an investor-level benefit. For instance, in *Ryan v. Gifford*, the Court of Chancery likened the corporate benefit from returned options to a "non-monetary recovery."[76] In that case, the Court of Chancery approved a derivative settlement and awarded counsel $9.5 million. The settlement included about $28 million from a corporate-level cash recovery, as well as the "cancellation, re-pricing, and surrender of thousands of stock options and . . . corporate governance reforms[.]"[77] The stock option settlement component was "properly considered . . . in determining a fee award" but not based on an investor-level benefit.[78]

Similarly, in *Louisiana State Employees Retirement System v. Citrix Systems, Inc.*, the plaintiff contended that its lawsuit caused the company to withdraw an option plan.[79] In its fee request, the plaintiff argued that the withdrawn option plan resulted in a $183 million benefit, which represented an attempt to "quantify the dilutive effect of the additional stock options authorized," *i.e.*, the supposed

---

[76] 2009 WL 18143, at *13.

[77] *Id.*

[78] *Id.*

[79] 2001 WL 1131364, at *1 (De. Ch. Sep. 19, 2001).

26

investor-level benefit. Counsel requested $2 million in attorneys' fees.[80] The Court of Chancery, however, declined to "engage in complicated and highly speculative intellectual exercises in attempting to quantify what is, in essence, the non-quantifiable benefit achieved by this litigation," and awarded $140,000 under *quantum meruit*.[81] Other decisions have not viewed option-related settlements as quantifiable investor-level benefits.[82]

Here, the court relied on a brief transcript ruling in *Wilcox v. Dolan*.[83] In *Wilcox*, the court awarded fees as a percentage of a $31 million value it assigned to

---

[80] *Id.* at *7.

[81] *Id.* at *9. *See also In re Investors Bancorp, Inc., S'holder Litig.*, C.A. No. 12327, Dkt. 253 at 12, 16, 23 (Del. Ch. June 17, 2019) (TRANSCRIPT) [hereinafter *Investors Settlement*] (settlement rescinded 75% of the contested equity awards, including options to non-employee directors; despite both parties' experts submitting "different valuations of the canceled options and restricted stock units," the court awarded fees under a *quantum meruit* approach).

[82] *See, e.g., Rovner v. Health-Chem Corp.*, 1998 WL 227908, at *4–5 (Del. Ch. April 27, 1998) (despite lawsuit enabling company to retain rights in options, finding that it was "unlikely that the [c]ompany would be in a position to exercise its [o]ptions prior to their expiration," and awarding fees under a *quantum meruit* approach); *Krinsky v. Helfand*, 156 A.2d 90, 94–95 (Del. 1959) (affirming the Court of Chancery's award of attorneys' fees because $500,000 was "probably a fair estimate of value recovered for the corporation[ ]," and noting general discomfort with using returned/cancelled options' intrinsic value; "[a]t the time of the settlement agreement the difference between the option and market prices was approximately $200,000 . . . [w]hile that value may not be measurable in dollars and cents, it certainly is a material factor in considering the terms of the settlement"); *Alvarado v. Lynch*, C.A. 2020-0237, Dkt. No. 42 at 9, 23, 30–34 (Del. Ch. June 21, 2021) (TRANSCRIPT) (awarding fees in case alleging excessive non-employee director compensation where, among other things, company agreed to limit future amount of option compensation; the court described the settlement as creating "some meaningful benefits for the corporation").

[83] *Wilcox v. Dolan*, C.A. No. 2019-0245, Dkt. 47 at 27–28, 30–31 (Del. Ch. Sep. 8, 2020) (TRANSCRIPT) [hereinafter *Wilcox*].

forfeited options and performance stock units.[84] The court also ordered the company to fund the fee award because it was "the company and its stockholders who have benefited[.]"[85] Notably, unlike the Stipulation here, the settlement stipulation in *Wilcox* did not address whether the underlying options were cancelled or if the encumbered shares were committed to a specific corporate purpose.[86]

We agree with the Court of Chancery's thoughtful analysis in *Goldstein v. Denner* of derivative litigation investor-level benefits in certain recurring circumstances. But those circumstances are not present here. The Stipulation did not result in "the functional and equitable equivalent of an entity-level recovery." The settling parties did not structure the Stipulation such that Tesla stockholders received a direct benefit from the settlement "that otherwise would go to [Tesla]."[87] Instead, the Director Defendants agreed to return to Tesla the Returned Options,

---

[84] *Id.* Strictly speaking, the court in *Wilcox* did not use the "intrinsic value" of the defendant's forfeited options. There was extensive expert testimony – which included a Black Scholes analysis – demonstrating that the fair market value of the underwater forfeited options and performance stock units was $31 million. *See generally* Ex. A to Pl's. Opening Br. in Supp. of the Proposed Settlement and Application for Attorneys' Fees and Expenses, *Wilcox v. Dolan*, C.A. No. 2019-0245, Dkt. 40 (Del. Ch. July 31, 2020).

[85] *Wilcox* at 30.

[86] *Compare* Stipulation and Agreement of Compromise, Settlement and Release, *Wilcox v. Dolan*, C.A. No. 2019-0245, Dkt. 32 (Del. Ch. June 18, 2020), *with* A276 (Stipulation § 2.3) (requiring the Returned Options to be cancelled and underlying shares returned to the 2019 Equity Incentive Plan). We note that in *Tornetta*, after the court ordered equitable recission of Musk's 303,960,630 options, the underlying shares became authorized, unissued stock. *Tornetta*, 326 A.3d at 1239.

[87] *Goldstein*, 2022 WL 1797224, at *19.

which were cancelled. The Stipulation was not intended to avoid the "wrongdoer benefit" problem – the Director Defendants returned options for cancellation. And the Stipulation was not part of a larger settlement in which the corporation bought out the minority stockholders as part of a derivative recovery, a controlling stockholder sought to pay less damages, or the investor-level benefit arose out of creditor or collectability issues.

We end where we started. Unless an investor-level benefit falls within a recognized exception, in a derivative action, the court must assess the benefit to the corporation. Here, the $458 million intrinsic value of the cancelled options – which the court characterized as an investor-level benefit – should have been excluded from the common fund calculation.

3.

The Plaintiff's counsel also argues that, in addition to "investor-level benefits," Tesla benefitted by at least $458.6 million from the Returned Options. They claim that Tesla is "now free to use the shares that the Returned Options covered . . . to compensate employees with restricted stock awards[.]"[88] Although the Returned Options freed-up the shares underlying the options for Tesla to use under the terms of its 2019 Equity Incentive Plan, Tesla counters persuasively that

---

[88] Answering Br. at 53.

counsel never demonstrated that a 1.4% increase to the 138 million shares already available under Tesla's equity compensation plans would be of value to Tesla, which did "not expect to come close to awarding the maximum limit of available [s]hares during the term of the 2019 EIP."[89] Other than that, counsel did not attempt to quantify a benefit to Tesla.

Of course, all things being equal, counsel is entitled to consideration of a fee for the non-quantifiable benefit to Tesla from the Returned Options.[90] But here, even without the nonquantifiable benefits, counsel will receive a fee of almost $71 million – not opposed by Tesla – for the excellent result they achieved. As we measure it, $71 million reflects a reasonable fee for counsel's efforts and does not result in a windfall.

4.

Finally, in *Tornetta*, the court remarked that refusing to extend derivative settlement benefits to the investor-level would be ill-advised. According to the court, "[b]ecause the investor-level benefits are often the primary benefit in those cases," excluding them "would eliminate compensable recovery for this category of

---

[89] A521 (Moore Aff. ¶¶ 14, 15).

[90] *See Ryan*, 2009 WL 18143, at *13 (fees awarded for "non-monetary" returned options benefit); *La. State Empls. Ret. Sys.*, 2001 WL 1131364, at *9–10 (awarding *quantum meruit* fee for causing "non-quantifiable" withdrawn options plan benefit); *Investors Settlement* at 12, 16, 23 (awarding *quantum meruit* fees for rescinded options compensation).

derivative suit[]," and "effectively eliminate any incentive for contingent-fee attorneys to pursue these claims."[91]

We have not eliminated purported investor-level benefits in derivative actions, just cabined them. As far as discouraging litigation, we are not so sure. Counsel continue to file and have recovered fees in derivative cases for nonquantifiable benefits to the corporation and its stockholders.[92] Counsel has in the past and can continue to secure a fee for non-quantifiable benefits in a derivative settlement or judgment.

## III.

Tesla agreed it would not contest the percentage the court applied to the common fund if the intrinsic value of the returned options is excluded from the

[91] *Tornetta*, 326 A.3d at 1245.

[92] *See Sciabacucchi*, 2023 WL 4345406, at *1, *4, *6 (awarding counsel fees in a derivative case for "therapeutic settlement of excessive non-employee director compensation claims," where the $1 million award was "based on a review of precedent"); *Howland v. Kumar*, C.A. No. 2018-0804, Dkt. No. 50 at 25–27, 30–32 (Del. Ch. Oct. 1, 2019) (TRANSCRIPT) (awarding fees following settlement in a derivative case providing for corporate governance reforms and repricing of options – did not use a percentage of the benefit approach); *In re Emerson Radio S'holder Deriv. Litig*, 2011 WL 1135006, at *2, *5–6 (Del. Ch. Mar. 28, 2011) (in addition to awarding percentage of monetary benefits conferred on corporation, the court awarded fees for therapeutic benefits which included "enhanced corporate governance procedures for related-party transactions"); *Schumacher v. Loscalzo*, 2023 WL 4842103, at *4–7 (Del. Ch. July 28, 2023) (in addition to awarding fees to counsel for quantifiable benefit in a derivative case, the court awarded $50,000 in fees for "mild therapeutic" corporate governance reforms, disclosure, and other enhancements); *Cal-Maine Foods, Inc. v. Pyles*, 858 A.2d 927, 929–30 (Del. 2004) (affirming award of attorneys' fees in derivative action which caused corporation to abandon going-private transaction, observing that there was a "substantial" benefit conferred, "although not one that was readily quantifiable"); *McDonnell Douglas Corp. v. Palley*, 310 A.2d 635, 636–37 (Del. 1973) (affirming fee award in derivative suit which caused corporation to cancel preferred stock issuance).

benefit conferred.[93]  It also agreed that the Plaintiff's attorneys were entitled to $70,918,136 if the court excluded the intrinsic value of the returned options from the corporate benefit received.[94]  The judgment of the Court of Chancery is affirmed in part and reversed in part.  Counsel are awarded $70,918,136 in fees and post-judgment interest from January 13, 2025.  Any disputes over the fee award should be brought before the Court of Chancery.  Jurisdiction is not retained.

---

[93] Oral Argument Video at 16:03–36, https://courts.delaware.gov/supreme/oralarguments ("The Court: So, your [ ] $70 million dollars that you're amenable to is the $276.6 in cash [and stock], which is a dollar-for-dollar benefit to Tesla . . . plus the $19.9 . . . and then multiplied by .24 . . . which you're not contesting? Counsel: If the Court reduces the net benefit to what we think is the accurate number, then we don't think the Court needs to go on to engage in the disputes about the declining fee percentage and the lodestar check because the reduction of the net benefit . . . has effectively solved that problem."); *see also* Opening Br. at 16 ("As a result, the fee award should be reduced to at most $70.9 million, which would reflect the actual benefit conferred on Tesla by this lawsuit, even under the oversized 24% fee percentage adopted by the Court of Chancery.").

[94] Calculated as ($276,616,720 (Returned Cash and/or Returned Stock) + $19,899,292 (Reverse Black-Scholes Charge) – $1,023,779 (Out-of-Pocket Litigation Expenses)) * .24 (Percentage Awarded).